IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.:  3:24 CR 00103 |
| | ) | |
| Plaintiff, | ) | Judge Thomas M. Rose |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID SNELL, | ) | |
| | ) | |
| Defendant. | ) | |

_____

DEFENSE SENTENCING MEMORANDUM
_____

Now comes David Snell, through undersigned counsel, and hereby presents the

following sentencing memorandum. It is respectfully submitted that after consideration

of all of the relevant factors in 18 U.S.C. § 3553(a), this Court should approve the plea

agreement entered into between Mr. Snell and the government, and find that 150

months is a sentence that is sufficient but no greater than necessary to fulfill the

purposes set forth in 18 U.S.C. § 3553(a)(2).

MEMORANDUM IN SUPPORT

**I.      Plea Agreement**

David Snell tendered a plea of guilty to Counts 2 & 4 of the First Superseding

Indictment. These Counts charge Mr. Snell with Coercion and Enticement in violation of

18 U.S.C. § 2422(b). Mr. Snell entered into a plea agreement with the government that

calls for Counts 1, 3, 5, and 6 to be dismissed at the time of sentencing. Pursuant to

Fed. R. Civ. Pro. 11(c)(1)(C), the parties agree that a term of imprisonment between 120 and 300 months is the appropriate disposition. Mr. Snell will have restitution obligations as a result of this plea, as well as reporting and registration responsibilities as a sex offender.

The Statement of Facts in Attachment A details Mr. Snell's conduct in violation of the aforementioned law. Mr. Snell's conduct is also detailed in the Presentence Report currently before the Court. The government will likely reiterate many of these facts in its memoranda to the Court. Accordingly, this memorandum will not rehash them in any way except to point out aspects of those facts that are relevant to this Court's consideration of the guidelines and its ultimate obligation to impose a sentence that is sufficient but no greater than necessary.

To be clear, Defendant does not intend in any way to trivialize or minimize the facts in this case; they are disturbing. They are this way in any child pornography case. But they should not be considered in isolation, nor presented for shock value as anticipated. It is these very facts that will guide this Court's review, consideration, and understanding of the guidelines applicable to this case. And this review will only be a rational, logical legal undertaking if done through a lens of objectivity, as the defense anticipates this Court will do.

It is respectfully submitted that this Court should accept the plea agreement. "A sentence imposed pursuant to a Type-C agreement is no exception to the general rule that a defendant's Guideline range is both the starting point and a basis for his ultimate sentence." *Hughes v. United States*, 584 U.S. 675, 686, 138 S.Ct. 1765, (2018). But,

2

"[t]o be sure, the Guidelines are advisory only, and so not every sentence will be consistent with the relevant Guidelines range." *Id.,* at 687. But it is the starting point for the Court, so we shall start there. Upon consideration of the guidelines and the other information set forth herein, this Court should accept the plea agreement and sentence within that range.

## II. Guideline Objections

The defense has lodged a number of objections, which even if rejected by this Court, are relevant to the ultimate sentence that is appropriate for Mr. Snell. These objections are addressed in a Second Addendum to the Presentence Report dated January 5, 2025. As the Court will certainly see, the old maxim that "bad facts make bad law" is still alive, well, and truer than ever. However, if the Court does not accept any of these objections, they at least provide important context relevant to sentencing.

### A. U.S.S.G. § 2G2.1(b)(2)(A)

The enhancement found in U.S.S.G. 2G2.1(b)(2)(A) is applied in paragraphs 39 and 49 of the PSR. The government and the PSR writer maintain that the offense involved "sexual contact" even though Mr. Snell only communicated over the internet. Thus, the offense only involves contact by the victims, with their own bodies. Admittedly, Courts have said this is enough by interpreting the statutory definition of "sexual contact" and its use of the phrase "any person" to include a person's touching of themselves. The defense would submit that if Congress intended this phrase to include self-touching, they would have used more exacting language. The United States Supreme Court has yet to rule on this issue.

3

It is important to emphasize though that this 2-point enhancement applies if the offense involved a "sexual act" or "sexual contact". The definition for "sexual act" under 18 U.S.C. § 2246(2) involves a variety of conduct involving the touching, contact and/or penetration of another. Assuming, *arguendo*, that Defendant's conduct fits within the confines of the "sexual contact" enhancement, it is only fair to put his actions on the lower end of the spectrum of conduct subsumed by this enhancement, given the remote and strained connection between Defendant's actions and the actions which meet the above definition of "sexual contact."

### B.  U.S.S.G. § 2G2.1(b)(3)

The enhancement found in U.S.S.G. § 2G2.1(b)(3) is applied in paragraph 40 of the PSR. The government and the PSR writer believe that this case involves "distribution" because Mr. Snell sent a video of Minor 1 to Minor 2. That is the full extent of the conduct invoking this enhancement, when the Guidelines' Application Note 1 explicitly contemplates broad distribution. This scenario has been addressed at least in the Second Circuit, as noted in the Second Addendum. The United States Supreme Court has not ruled on this issue. It should seem clear that this Guidelines enhancement is concerned with the mass distribution of child pornography to others. But if a single instance results in its application, it is again important to place such distribution on the spectrum of distribution that is possible in the modern world.

### C.  U.S.S.G. §§ 3D1.4 and 4B1.5

The interplay between U.S.S.G. §§ 3D1.4 and 4B1.5, and perhaps more importantly the application of 4B1.5(b) to Mr. Snell's case, illustrates exactly why the

4

Guidelines should be, and thankfully are advisory in nature. Guideline section 4B1.5(a) is designed to provide greater punishment to a sex offender that is being punished for another sex offense after already having been convicted of a prior sex offense. As such, that person is engaging in a "pattern" of sex offenses after already having been sentenced and having received the punitive effects of incarceration and the benefits of rehabilitation while on supervised release. Yet, under the government's theory, that person should not be punished more severely, it should be the first time offender that gets convicted of two offenses that took place between a period of 19 days. This is because the application of 4B1.5(b) to Defendant, as proposed in the PSR, results in a greater Guideline Total Offense Level (42), than if 4B1.5(a) was applied to him. If 4B1.5(a) was applied to Defendant, his Total Offense Level would be 37. Even with the imposition of a criminal history category V, as would be called for by 4B1.5(2), the guideline sentencing range for Defendant would be less than the 360 months to life called for in the PSR.

The case law admittedly does not support the defense's position that 4B1.5(b) should not apply to Defendant. But, in this case the Guidelines do not make sense. It is respectfully submitted that this scenario should result in reconsideration of the case law.

### D.  Conclusion Regarding Guideline Objections

In the very least, the Guidelines should make some sense, or they should not be considered at all. The defense has raised objections to the application of certain Guidelines for which the case law from the Circuits does not generally support, but for which the Supreme Court has yet to give the final word. Accordingly, it would be

5

understandable if this Court overruled those objections. However, in Mr. Snell's case it is respectfully requested that the Guidelines be given the respect to which they are due, understanding the very limitations of the undertaking the Guidelines strive to achieve. To the extent that Defendant's conduct actually fits within these enhancements, it falls at the very low end of the spectrum of prohibited conduct. The result is artificial if not unintended inflation of the Guidelines' application to Mr. Snell. This backdrop should inform the Court's consideration of the factors in 18 U.S.C. § 3553(a).

### III. Consideration of 18 U.S.C. § 3553(a)

The U.S. Supreme Court long ago rejected the notion that the U.S. Sentencing Guidelines evinced mandatory ranges for sentencing of individual defendants. The Court has taken the position that the guidelines, as their name would suggest, are to be viewed as advisory:

> This Court's remedial opinion in *United States v. Booker*, 543 U.S. 220, 244, 125 S.Ct. 738 (2005) instructed district courts to read the United States Sentencing Guidelines as 'effectively advisory,' * * * In accord with 18 U.S.C. §3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence. *Booker* further instructed that 'reasonableness' is the standard controlling appellate review of the sentences district courts impose."

*Kimbrough v. United States*, 552 U.S. 85, 128 S.Ct. 558 (2007)(citing *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005)).

Specifically, the Supreme Court has directed lower courts to begin with the calculation of the defendant's guideline range. "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark". *Gall v. United States*, 552 U.S. 38, 49, 128 S.Ct. 586, 596 (2007). If courts

6

had no discretion to deviate from the guideline range, the instructions would end here. However, *Gall* continues, instructing courts that the inquiry does not end with the calculation of the guideline range.

> The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

*Ibid* (citing to *Rita v. United States*, 551 U.S. 338, 351, 127 S.Ct. 2456, 2465 (2007)).

The Court in *Rita* indicated that "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that *might* achieve §3553(a)'s objectives." *Rita*, *supra*, at 350 (emphasis added). Yet, as it regards deviations from the guidelines, this is not dispositive. Both *Rita* and *Gall* agree that the presumption of reasonableness that applies where a court imposes sentence within the guideline range does not indicate a presumption of unreasonableness where they deviate. "A nonbinding appellate presumption that a Guidelines sentence is reasonable does not require the sentencing judge to impose that sentence." *Rita*, at 353. Yet, "[t]he fact that we permit courts of appeals to adopt a presumption of reasonableness does not mean that courts may adopt a presumption of unreasonableness." *Id.*, at 354-355. Taking this a step further, *Gall* advocates for deference to the trial court.

> [I]f the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The

7

> fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.
>
> * * *
>
> The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record. (citation omitted). "The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court."

*Id.*, at 51, 52 (quoting *Rita*, at 357-358).

Thus, where the Court's reasoning behind a deviation from the sentencing guidelines is not unsound, it will not be disturbed upon review. That determination requires first, procedural reasonableness and second, substantive reasonableness. "A sentence may be procedurally unreasonable if "the district judge fails to 'consider' the applicable Guidelines range or neglects to 'consider' the other factors listed in 18 U.S.C. § 3553(a)" *United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006)(quoting *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005)). The *Collington* court then noted that substantive unreasonableness may exist where a court "select[s] the sentence arbitrarily, bas[es] the sentence on impermissible factors, fail[s] to consider pertinent § 3553(a) factors or giv[es] an unreasonable amount of weight to any pertinent factor." *Ibid*, (quoting *Webb, supra*, at 385.). Absent such procedural or substantive unreasonableness, however, a district court's sentence may not be reversed upon review.

In *Gall*, for example, the Supreme Court found that the district court had properly considered the guideline sentence and the factors set forth in 18 U.S.C. §3553(a), and

8

had provided sound reasoning for the weight given to each factor resulting in its downward deviation from the guideline recommendations. *Gall*, at 53. This resulted in a finding that "the opinion of the Court of Appeals… [did] not reflect the requisite deference and [did] not support the conclusion that the District Court abused its discretion." *Id.*, at 52-53.

Consistent with the principle that the Guidelines do not account for the unique facts and circumstances that accompany each case, Title 18 sets forth numerous factors for consideration when imposing sentence. Many of these factors, when met, may and often do present the need for a downward deviation from the guideline range. As set forth herein, that is the instant case.

### A. Variation from the Guideline Sentencing Range is Consistent with Considerations of Mr. Snell's History and Characteristics

This Defendant's history and characteristics indicate that an appropriate sentence in this case should vary from the range set forth in the U.S. Sentencing Guidelines. Title 18 sets forth numerous factors to be considered by the Court when imposing sentence. This is particularly relevant in light of the Court's duty to impose a reasonable sentence that is not greater than necessary. *See Kimbrough*, supra.

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider * * * the nature and circumstances of the offense and the history and characteristics of the defendant

18 U.S.C. §3553(a)(1).

Far from a foreign concept, courts often deviate below the guideline range pursuant to §3553(a)(1). For example, in *United States v. Collington*, 461 F.3d 805

9

(2006) the Sixth Circuit upheld a downward variance where such was based in part upon the defendant's lack of a criminal history and desire to reform. "First, the district court felt that the sentencing guidelines did not accurately reflect Collington's actual criminal history. Additionally, the district court appeared to be persuaded by the fact that Collington… was an ideal candidate for reform." *Collington*, at 809. The court in *Collington* found that the district court had considered more than just the guideline range itself and the factors that contribute thereto. Rather, "the record shows a deep consideration of the seriousness of the offense which the district court referred to the crime as 'heinous' and 'particularly offensive.'" *Ibid*.

This, was coupled with the court's consideration of the defendant's criminal history, personal history ("including the early deaths of his parents and the mistreatment from his other relatives[.]") *Ibid*. Ultimately the court found compelling the balance of the need for the sentence imposed to sufficiently "reflect the crimes committed while allowing for the possibility that [the defendant] may reform" and "go on to a productive life in society." *Ibid*, (citing *United States v. Martin*, 438 F.3d 621, 642 (6th Cir. 2006)). See also *United States v. Jordan*, 544 F.3d 656 (6th Cir. 2008)(upholding a district courts downward deviation which cut the guideline sentencing recommendation nearly in half).

Likewise, the decision in *Gall*, *supra*, itself serves as an example where the district court determined, based in large part upon the characteristics of the Defendant, deviated from the sentencing guidelines' recommendation. Specifically, the *Gall* court imposed a sentence of 36 months of probation where the guidelines called for 30 to 37

10

months imprisonment. *Gall*, at 45. There the district court, whose sentence was ultimately upheld by the Supreme Court, found the Defendant's criminal history and his apparent addiction to be compelling factors justifying a downward deviation. *Id.*, at 57. Most, compelling, however, was the defendant's change of heart. *Id.*, at 58.

In the instant case several considerations housed within §3553(a)(1), many of which were used to support the sentences in the above referenced cases, are particularly relevant to the court's consideration and indicate not only that a variance is appropriate in this case, but necessary for a reasonable sentence as set forth below.

### i.     The Individualized Risk Assessment of Mr. Snell Supports Variation from the Guideline Range

On June 18th, 2025, Dr. Stuart Bassman conducted an Individualized Risk Assessment interview with Mr. Snell. (*Bassman Report*, at 1, 3). On January 16th, 2026, Dr. Bassman testified at a sentencing hearing in this matter regarding the Individualized Risk Assessment of Mr. Snell. (see generally, *Bassman Hearing Transcript*).

Dr. Bassman found that Mr. Snell does not present with psychopathy or antisocial personality disorder and other significant antisocial features. (*Bassman Hearing Transcript*, at 15, 16, 43, 44, and 75). Dr. Bassman noted that the lack of antisocial features was particularly noticeable in the way "that he was realizing[,] that he was beginning to recognize[,] the lies he was telling himself." (*Bassman Tr.*, at 44; see also *Bassman Report*, at 4). This was described as a sharp departure from the norm, where "[w]hen a person has significant antisocial features, they become aware of their lies but they continue to rationalize them." (*Ibid*). This distinction, the lack of such antisocial features, is a significant factor in the prognosis for change. (*Id.*, at 45).

11

In that vein, and particularly relevant to Dr. Bassman's evaluation of Mr. Snell was the latter's view of his own actions. (*Id.*, at 18, 24, 44). "Over the course of 51 years, I've had countless defendants say [']I'm sorry.[']" (*Id.*, at 17). "I hear so many defendants say [']I'm sorry.['] My first reaction [is] [']yes, you're sorry you got caught.['] But with David it was different[;] I heard genuine regret." (*Id.*, at 22). "In David's case, what I heard is [']I'm sorry and I want to change.[']" (*Id.*, at 17).

> [T]he fact[ors] that, reduce the risk are considered what's called productive factors. * * * [T]he extent to which someone is willing to be honest, the extent to which somebody's willing to be accountable. ***The bottom line is whether they're willing to change their life so instead of having a level – well, a double life, rather, being authentic, being real, being genuine. And recognizing the harm you've done[,] [a]nd making a lifelong commitment to change***.

(*Id.*, at 24)(emphasis added).

In this regard, Dr. Bassman noted that Mr. Snell was both honest and engaging during his evaluation, as Mr. Snell was forthcoming in manners which tended to paint him in a more negative light. (*Id.*, at 39-41). More than attempting to use his evaluation as a confessional, Mr. Snell expressed, as noted above, significant regret for his actions without shying away from their graphic nature:

> It was David who shared with me in jail when he saw what these young girls were doing in this chat room, he stopped. He was horrified. He was horrified about what he had enticed these girls to do. He began to cry when I was meeting him at this point. He couldn't believe what he had orchestrated. And then he went on to speak about loving children, and then he began to shake his head and says ["]I can't believe it, what I did.["]

(*Id.*, at 20-21).

Additionally, Mr. Snell also does not demonstrate entrenched, fixated, pedophilic arousal. (*Id.*, at 21, 50). The absence of these factors indicate that he falls below the

12

risk profile of offenders with an offense level of 42 as presumed by the sentencing guidelines. (*Id.*, at 15-18, 21-23, 43-44, 50, and 75). Although Dr. Bassman's testimony indicates that this is not an indication that there is no commonality of factors between Mr. Snell and other offenders who would more aptly fit the mold of a typical level 42 offender, these factors are considered a continuum rather than a checklist. (*Id.*, at 18, 19, 20, 23, 31, 47, 57, and 73). As such, the degree to which individual risk factors are present cannot be discounted. Further contributing to his reduced risk profile is Dr. Bassman's finding that those risk factors presented by Mr. Snell are considered both dynamic and manageable rather than immutable. (*Id.*, at 23).

> [W]e look at what's called dynamic risk factors and static risk factors. Static risk factors are something that that's unchangeable – your age, your demographics. But what we focus on in treatment [are] dynamic [factors], and dynamic means changeable. * * * I believe that David can learn, change, and develop.

(*Id.*, at 23-24).

Finally, as discussed throughout Dr. Bassman's report and testimony, Mr. Snell is more aptly characterized as a fantasy offender, having made no physical contact and taken no steps to make physical contact with either victim in this matter. (*Id.*, at 20, 47, 73, 77-78; *Bassman Rep.*, at 5). Thus, it would seem that while he was able to maintain a level of cognitive dissonance for a period, once the veil fell and he was faced with the reality of his actions, Mr. Snell was horrified with what he had orchestrated. (*Bassman Tr.*, at 21; *Bassman Rep.*, at 4-6, 8).

Mr. Snell's individualized risk assessment paints a much different picture than the guideline range anticipates based upon the typical, similarly situated, offender. (*Id.*, at 75). Rather, the "[c]onclusion is that he's at lowest risk" of committing a hands-on sexual

offense. (*Id.*, at 22). Indeed, the guidelines assume a level of dangerousness that is simply unsupported by the evidence here. (*Id.*, at 76). Based upon his Individualized Risk Assessment variation from the guidelines is supported by Mr. Snell's characteristics and history.

### ii. The Distinct Lack of an Escalating Pattern Supports Variation from the Guideline Sentencing Range

Mr. Snell does not have a history of escalating sexual misconduct. While some of his behaviors progressed from viewing pornography to engaging in chat room discussions, the evidence actually suggests that his sexual behavior deescalated after his marriage as he reported that he no longer sought out sexual encounters with multiple partners. (*Bassman Tr.*, at 51-52). Moreover, the facts of this case occurred over a relatively short period of time, i.e. between May and June of 2024. (ECF Doc #1). Rather than demonstrating conduct embedded in a lifelong trajectory, the short timeline of offensive behavior is more indicative of an aberration. Without discounting the seriousness of Defendant's conduct, there is no evidence that would suggest that Mr. Snell's actions in this case were part of a pattern of repeated offenses across any notable length of time. Instead, Mr. Snell engaged in serious, but isolated, conduct over a short period of time. As noted above, there is also evidence in the form of his self-reflection, honesty about his actions, and desire to engage in treatment and effect material change within himself, that the pattern would not have continued. Regardless, there remains little to no evidence that would suggest a greater pattern or history of sexual misconduct.

Although the guidelines tend to lend significant weight to the characteristics of the offense, a key factor in their consideration is and must be whether the conduct reflects a continuing pattern or an aberrational episode. Here, the offense conduct does not reflect entrenched criminal identity, and any future risk that Mr. Snell would reoffend is minimal. Thus, variation from the guidelines is further supported by the relatively short timeline and isolated nature of the offenses.

Therefore, the factors set forth for consideration in 18 U.S.C. §3553(a)(1) support a downward deviation from the guideline sentencing range.

### iii. Other Factors Informing Mr. Snell's Character and History.

Mr. Snell, like the Defendant in *Gall*, has exhibited signs of addiction, in his case addiction to alcohol and pornography. Like the defendant in *Collington*, his history reveals unresolved trauma stemming from mistreatment by family members. (*Bassman Tr.*, at 25, 36, 37, and 75). In Mr. Snell's case, he used alcohol and pornography as mechanisms to cope with his mental health and lasting childhood trauma. (*Id.*, at 25). Although Dr. Bassman's evaluation of Mr. Snell did not involve formal diagnosis, there was significant discussion at the sentencing hearing regarding Mr. Snell's apparent alcohol use disorder. (*Id.*, at 47). In fact, based upon his Individualized Risk Assessment it was clearly a contributing factor, regardless of whether Mr. Snell was actively engaged in it at the time of the commission of the offenses. (*Id.*, at 16, 23, 43, 45, and 47). Yet in spite of this, Dr. Bassman described a man who yearned to be upstanding and productive. (*Id.*, at 21, 24, 33, 39, and 57). The duality this created was such the Dr. Bassman likened David to Dr. Jekyll and Mr. Hyde:

15

> To a great extent, David lived a double life. It reminds me of a book by Robert Louis Stevenson, *Dr. Jekyll and Mr. Hyde*. Dr. Jekyll was considered a very benevolent, kind person; but then he would drink and become Mr. Hyde: devious, cunning, manipulative, hurtful, harmful.

(*Id.*, at 21, and 55). "[H]e definitely struggled with self-regulation. However, he can manage his life fairly well during the day. So, again, it's that double life. It's the duplicity. It's the Dr. Jekyll and Mr. Hyde." (*Id.*, at 55).

Sourcing addictions is not always simple or easy. Although Mr. Snell has a great support system now[1], with family that will readily rally around him to lend assistance and guidance, that was not always the case. Even where appearances would indicate otherwise, there can be something insidious festering below the surface. Trauma, whether incidental or the result of malice can linger in the shadows, eventually manifesting itself in addictions used to numb or escape. (*Bassman Tr.*, at 25)("David didn't realize that he was abused, that he was hurt, and as a result of that put himself in positions where he would hurt others. He needs to recognize that so he can heal, so he can change").

"David shared with me not feeling safe in the home he grew up in. So on the outside it was a very loving home, but he didn't feel safe." (*Ibid*). His family acknowledged that David and his brother had a strained relationship during his childhood. (*Id.*, at 36). Yet, for David the hurt was deeper than perhaps it appeared at surface level. (*Id.*, at 25, *Bassman Rep.*, at 4).

> He indicated that there were many incidents of abuse and emotional harassment, but one that he focused on was when his older brother tied

---

[1] See letters attached to this memorandum.

16

up his hands and feet and threw him into a pool only to save him after a few minutes of his floundering and thrashing around.

(*Bassman Rep.*, at 4; *Bassman Tr.*, at 25).

I see David as still being tied up. I see David as still having his head barely above the water, that he is still drowning, that he is still tied up. That the ropes are on the inside. That he's still drowning. But he needs to learn how to live a life of integrity. And I believe he can do that.

(*Bassman Tr.*, at 25).

This childhood trauma has had lasting repercussions and ripple effects throughout David's life. Left unresolved it manifested itself in the form of addictions, which David consistently used to cope or ignore the wounds it left.

## B. Variation from the Guideline Sentencing Range is Consistent with Considerations of the Need to Protect the Public from Further Criminal Activity by Mr. Snell

Other considerations, such as the need to protect the public from further criminal activity would also indicate that a deviation below the guideline range is warranted. This is particularly true when considering the factors discussed above (i.e. Mr. Snell's genuine remorse, his amenability to change, his lack of a criminal history, and the lack of evidence of an ongoing pattern of conduct).

The court, in determining the particular sentence to be imposed, shall consider * * * the need for the sentence imposed * * * to protect the public from further crimes of the defendant

18 U.S.C. §3553(a)(2)(C).

Several considerations lend themselves to the proposition that "the need for the sentence imposed to protect the public from further crimes" is satisfied with a downward variance from the guideline sentencing range. Chief among these considerations is the diminishing returns of incarceration. Incapacity is not the only means of protecting the

17

public. Because risk reduction does not increase linearly with length of sentence[2] there is a point at which continued incarceration yields minimal public-safety benefits.[3] This is even more true where, as here, treatment is the preferred option and is clearly desired by the offender. (*Bassman Tr.*, at 16-18, 20-22, 24, 26, 39-41, 45, 55, 76, 78-80; *Bassman Rep.*, at 5-6, 8, 10, 12-13). Treatment and supervision are the key driving forces in reducing recidivism and, thereby, increasing public safety.[4] The key

---

[2] "Evidence shows that criminal careers are relatively short, in the range of 10 years, meaning that continued incarceration beyond this point produces diminishing returns on public safety, wasting limited resources that could be put toward effective crime prevention strategies." *Mass Incarceration Trends*, The Sentencing Project, May 21, 2024, at 10. https://www.sentencingproject.org/app/uploads/2024/05/Mass-Incarceration-Trends.pdf (citing Blumstein, A., & Piquero, A. (2007). Restore rationality to sentencing policy. Criminology & Public Policy, 6(4), 679-687; Kazemian, L. (2021). Pathways to desistance from crime among juveniles and adults: Applications to criminal justice policy and practice. National Institute of Justice; Kazemian, L., & Farrington, D. P. (2018). Advancing knowledge about residual criminal careers: A follow-up to age 56 from the Cambridge Study in Delinquent Development. Journal of Criminal Justice, 57, 1-10; Piquero, A., Hawkins, J., & Kazemian, L. (2012). Criminal career patterns. In R. Loeber & D. P. Farrington (Eds.), From juvenile delinquency to adult crime: Criminal careers, justice policy, and prevention (pp. 14–46)).

[3] Lauren-Brooke Eisen, *Diminishing Returns of High Incarceration: Column*, USA Today, Dec. 15, 2016. https://www.usatoday.com/story/opinion/2015/02/13/incarceration-jail-crime-decline-study-column/23308913/

[4] "Over thirty years of research in the field of corrections has examined the effectiveness of various community-based interventions at preventing criminal recidivism... Interventions have included specialty courts, probation and parole, residential programs, home detention, electronic monitoring, boot camp, and scared straight programs. These studies showed that relying primarily on surveillance and punishment is ineffective at preventing criminal recidivism, and they underscored the need for rehabilitative approaches to corrections. * * * Effective prevention requires mental health and criminal justice professionals to have a shared appreciation of the issues driving each client's recidivism and of their respective best practices." J. Steven Lamberti, *Preventing Criminal Recidivism Through Mental Health*, HHS Psychiatr Serv., June 9, 2020. https://pmc.ncbi.nlm.nih.gov/articles/PMC7280932/pdf/nihms795631.pdf (citing Andrews, DA, Bonta, J. *The Psychology of Criminal Conduct*. 5th. New York NY: Routledge, 2010; Gendreau, P. *The principles of effective intervention with offenders; in Choosing Correctional Options That Work: Defining the Demand and Evaluating the*

component being the collaboration between treatment and supervision.[5] Thus, long-term supervision, monitoring, and accountability materially reduce the risks to the community by addressing identified risk factors.

An additional consideration when weighing whether the sentence is greater than necessary is the unfortunate reality of the rate at which imprisonment reduces life expectancy. At least one study, cited by the Second Circuit, has indicated that imprisonment reduces life expectancy by an average of two (2) years for each year served.[6] "Although no one knows with any certainty how long [the defendant] will live, we do know that, as a statistical matter, the life expectancy of an incarcerated person drops significantly for each year of incarceration." *United States v. Jenkins*, 854 F.3d 181, 186 (2nd Cir. 2017)(citing Evelyn J. Patterson, *The Dose Response of Time Served in Prison on Mortality: New York State, at* 526). Employing the Social Security Administration's Life Expectancy Calculator, Mr. Snell's baseline life expectancy is 81.9 years.[7] Applying the findings of the Patterson Study, Mr. Snell's life expectancy drops to

---

*Supply.* Harland, AT, editor. Thousand Oaks, CA: Sage Publications, 1996; and Andrews, DA. *An overview of treatment effectiveness: Research and clinical principles.* Ottawa, Ontario, Canada: Department of Psychology, Carleton University, 1994.)

[5] *What Works to Reduce Recidivism: An Examination of Research- and Evidence-Based Principles, Practices, and Programs*, GEO Reentry Services. https://www.georeentry.com/wp-content/uploads/what-works-02-21.pdf

[6] Evelyn J. Patterson, *The Dose Response of Time Served in Prison on Mortality: New York State, 1989-2003*, 103 Am. J. of Pub. Health 523 (2013).

[7] Social Security Administration, Retirements & Survivors Benefits: Life Expectancy Calculator, https://www.ssa.gov/cgi-bin/longevity.cgi.

52.3 years.[8] Thus, as Mr. Snell is currently 37 years old, even a sentence of fifteen (15) years is effectively a life sentence.[9]



---

[8] "Jail and prison inmates experience disproportionately high levels of chronic and acute physical health problems. * * * With regard to higher morbidity rates among inmates, the number of inmates dying from natural causes increased from 946 in 1990 to 2,105 in 1999, an increase of 123 percent. As a prisoners' length of stay increases, these problems are likely to intensify." U.S. Dept. of Justice, Nat. Inst. of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, 9 (2004).

[9] Defendant also notes that the studies informing this calculation involved the effect serving a prison sentence has on life expectancy. Neither study indicates to what extent, whether equivalent or not, local incarceration has on life expectancy. As such, this calculation assumes that Mr. Snell's incarceration begins at sentencing, but it is worth noting that as of the filing of this memorandum, he has served well over a year in jail.

20

Owing to these considerations, supervised release can and often does substitute for additional years of incarceration. Anecdotally, Dr. Bassman indicated during his testimony at the sentencing hearing that in his vast experience, Federal Probation does an excellent job of marrying monitoring and treatment for probationers. (*Bassman Tr.*, at 27-28).

> I think the federal government does an excellent job with probation. Excellent. Excellent. They use the polygraph. They do unscheduled house checks. * * * I've been critical of a lot of state probations because they just are very nonchalant. They forget that their role is community control, community management. So I've been and still am very impressed with probation, federal probation, because they check, they monitor, they take it very seriously.

(Ibid).

Accommodating these principles, 18 U.S.C. §3553(a) requires tailored sufficiency of sentence, not maximum punishment. Put differently, a properly crafted sentence seeks a reduction in the recidivism of the *specific defendant*, requiring more than reference to charts, statistics, and calculations. It instead requires thoughtful application of sentencing principals on a case-by-case basis.

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

*Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 2053 (1996).

To that end, the Court must ensure that its sentence adequately protects the public but is not greater than necessary to accomplish that goal. Rather than focusing on strict adherence to guideline sentencing ranges, the Court should instead determine

21

an appropriate sentence for this individual defendant, not the mathematical equation alleged to represent him.[10]

An appropriate period of incarceration in conjunction with the employment of mental health treatment and supervised release as a protective mechanism strikes a balance between the need to protect the public and the requirement that the sentence is not greater than necessary. The availability and effectiveness of alternative methods of risk reduction (especially when there is a genuine desire to change as Bassman states of Mr. Snell), such as lifetime supervised release, reporting and registration requirements as a sex offender, restrictive conditions, and mandatory treatment further emphasize that a downward deviation from the sentencing guidelines is appropriate here.

### C. Variation from the Guideline Sentencing Range is Consistent with Considerations of the Need to Provide Mr. Snell with Education, Correction, and Treatment

The combination of treatment and supervision described above requires implementation of education, correction, and treatment working in conjunction with one another to reduce the risk of recidivism and therefore protect the community. They are also a component of the required sentencing considerations:

> The court, in determining the particular sentence to be imposed, shall consider * * * the need for the sentence imposed * * * to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

---

[10] "We reject, however, an appellate rule that requires "extraordinary" circumstances to justify a sentence outside the Guidelines range. We also reject the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Gall*, at 47.

18 U.S.C. §3553(a)(2)(D).

As detailed, *supra*, long-term incarceration presents diminishing returns, particularly after the ten (10) year mark. The main drivers of risk reduction are treatment and supervision, not length of incarceration. A sentence consistent with these principles would naturally satisfy the requirements of "providing the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." See 18 U.S.C. §3553(a)(2)(D). This is particularly true where, as here, the defendant desires treatment and change. As established by Dr. Bassman through both his report and testimony outlining the Individualized Risk Assessment, Mr. Snell is not only amenable to treatment but is an excellent candidate for it. (*Bassman Tr.*, at 15-18, 22, 39-41, 43-45, 50, and 75; *Bassman Rep.*, at 4). Mr. Snell has demonstrated, among many other considerations and factors, the insight and desire necessary to be successful in treatment. (*Bassman Tr.*, at 15-18, 20-22, 24, 39-41, 43-45, 75).

Incarceration alone does not meaningfully advance rehabilitation and will not accomplish the goals of "provid[ing] the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." While meaningful treatment can be made available during incarceration it has both greater availability and effectiveness during supervised release because the Federal Bureau of Prisons' ability to provide timely, specialized, treatment is limited. Therefore, a downward deviation from the guideline range is both appropriate and necessary based upon 18 U.S.C. §3553(a)(2)(D).

### D. Considerations of the Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants

Mr. Snell's amenability and desire for treatment and change provide clear indications that his risk profile is lower than the typical offender with a level 42 offense and guideline range of 360 months to life imprisonment. Considering the totality of factors set forth in §3553(a) as outlined herein, Mr. Snell's case is not only atypical but his remorse and desire for treatment clearly warrant downward deviation from the guideline range. Therefore, deviation, as contemplated under subsection (a)(6), is not a matter of disparity between like charged offenders, but differentiation.

> The court, in determining the particular sentence to be imposed, shall consider * * * the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".

18 U.S.C. §3553(a)(6).

The operative word here is *unwarranted*. The sentencing guidelines by their nature attempt to compartmentalize defendants, forcing them into groups which can include a broad spectrum of facts and circumstances. In doing so, the guidelines tend to reduce cases and defendants into mathematical variables. This may promote judicial economy, but it does so at the expense of grouping together defendants and cases that often present vastly different risk profiles. It should be noted here, that the Supreme Court views 18 U.S.C. § 3553(a)(6) as cutting both ways. "[I]t is perfectly clear that the District Judge considered the need to avoid unwarranted disparities, but also considered the need to avoid unwarranted similarities among other co-conspirators who were not similarly situated." *Gall*, at 55.

24

The point of this discussion is to illustrate how merely looking at other sentences of other similarly situated defendants, and the sentences they received, is not always helpful to the Court when considering this factor. Outliers exist, but even comparing Mr. Snell's situation to that of others provides interesting information. Christopher Jewett received a 300 months sentence in this District. 3:24-cr-00065-MJN. He entered into a plea agreement that included a Rule 11(c)(1)(C) provision that had an agreed disposition of 300 months. Mr. Jewett was already a registered sex offender, on supervised release to this Court, when he was indicted for enticing minors to provide pornography.[11] The typical penalty for a registration violation that is the result of a new offense is 10 years, *consecutive* to the sentence for the new offense. 18 U.S.C § 2260A. The nature of such a plea agreement could be viewed as explicit understanding by the U.S. Attorney's Office that this Court can and should impose a sentence well below the maximum (300 months) called for by Mr. Snell's plea agreement.[12] Matthew Shoffstall was also sentenced to 25 years in this District. 3:24-cr-00047-MJN-1. Although the plea agreement is sealed, the Indictment reveals more egregious conduct than that of Mr. Snell, and is reasonably believed to have involved direct physical contact with a victim.

This is just a small sample, and a more in depth analysis will be conducted if the Court requests. But in the Southern District of Ohio it appears that a sentence of 300

---

[11] The Dayton Daily News reported that the U.S. Attorney's Office press release said that "in summer 2023 and spring 2024, Jewett communicated with adolescent girls online through a virtual world and social networking website, sending them explicit videos and asking for explicit videos in return.
[12] It also has interesting reference to the discussion in II.C, *supra*.

25

months is generally reserved for defendants that have had a prior sex offense, and/or engaged in much more egregious conduct than Mr. Snell.

As Dr. Bassman expressed at several instances during his testimony at the sentencing hearing in this matter, Mr. Snell's risk profile is considerably lower than his guideline level of 42 would suggest. (*Id.*, at 31, 75-76). This should, perhaps, come as little shock as offense labels do not capture clinically relevant differences between offenders' varying risk profiles. Owing to this, uniform guideline ranges can themselves create unwarranted sentencing similarities among substantially unlike defendants. Thus, the need to view the U.S. Sentencing Guidelines as advisory, as set forth in *Booker*, *supra*, and *Kimbrough*, *supra*, is paramount. Viewing downward deviations in light of the differences between grouped defendants assists in achieving this requirement.

Here, for reasons outlined, Mr. Snell presents substantial differences from the risk profile contemplated by the sentencing guidelines. The manner of rigid and unyielding adherence to guideline ranges that would deny or ignore Mr. Snell's low risk profile is antithetical to the considerations required by 18 U.S.C. §3553(a) and the U.S. Supreme Court's rulings in *Booker*, *Kimbrough*, and their progeny. Thus, because Mr. Snell present a low risk profile, bolstered by his recognition of and remorse for his actions, and a desire to engage with treatment and manifest meaningful change within himself, a downward deviation from the guideline range is differentiation rather than disparity. Such differentiation is therefore endorsed by Title 18 and the U.S. Supreme Court.

**IV. Conclusion**

This Court should reconsider the enhancements the Government seeks to apply in this case. In the very least, they should be put in their proper context; on the lower end of the spectrum of conduct subsumed thereby. David Snell presents what Dr. Bassman deemed a "low risk profile." He has acknowledged his actions and expressed genuine remorse for what he orchestrated. He has demonstrated that he is amenable to treatment and presented the characteristics necessary for reform. His actions were largely born out of unresolved trauma and resulting addictions which lingered and went untreated. He has essentially no criminal history and the conduct in this matter occurred over a very short period of time. As expressed by Dr. Bassman, he is an excellent candidate for treatment. Considering the diminishing returns that incarceration sees, especially contrasted with the benefits of treatment paired with supervision and other restrictions, a sentence at the lower end of the range in the plea agreement is warranted.

Wherefore, this Court should find a sentence of 150 months to be sufficient but not greater than necessary to comply with the purposes and principles set forth in 18 U.S.C. § 3553(a)(2).

Respectfully submitted,


/s/Anthony R. Cicero
ANTHONY R. CICERO #0065408
ATTORNEY FOR DEFENDANT
CiceroAdams, LLC
500 East Fifth Street
Dayton, Ohio 45402

27

937.424.5390 phone
937.424.5393 facsimile
tonycicero@gocicero.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to opposing counsel.

/s/Anthony R. Cicero
ANTHONY R. CICERO #0065408
ATTORNEY FOR DEFENDANT
CiceroAdams, LLC
500 East Fifth Street
Dayton, Ohio 45402
937.424.5390 phone
937.424.5393 facsimile
tonycicero@gocicero.com

28